Exhibit B

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF COLORADO
 3
 4   LILYBETH COPE, individually and  ) Civil Action No.
     on behalf of others similarly    ) 1:17-cv-02744-MSK-NYW
 5   situated,                        )
                                      )
 6                 Plaintiffs,        )
                                      )
 7                                    )
     v.                               )
 8                                    )
     DAVITA HEALTHCARE PARTNERS, INC. )
 9   and TOTAL RENAL CARE, INC.,      )
                                      )
10                 Defendants.        )
     _____)
11
12
13
14          DEPOSITION OF JANNIE DEPTOWICZ-BITUIN
15                    San Diego, California
16               Wednesday, November 28, 2018
17                         VOLUME I
18
19
20
21   Reported by:
     ANELA SHERADIN, CSR NO. 9128
22
23
24
25   Job No. CS3125821
```

Page 165

1  clinics I have been to, like the Lake Elsinore, the
2  Diamond Valley one, that it's the same -- you know, the
3  same job titles.
4  BY MS. von GRABOW:
5      Q   And you don't know if the job duties are the
6  same, though; correct?
7      A   I don't know their specific job, but DaVita
8  trains everybody the same way so that when you go to one
9  clinic to another, you are not lost because you already
10 know what to do, the same computer system and the same
11 way of doing things.
12     Q   How do you know that?  How do you know that
13 DaVita trains everyone the same?
14     A   Because that's what they -- that's what they
15 say.  That's what we are told; that you can go to any
16 DaVita and it will be the same -- you know, the same.
17 It's the same number of how you prime the machine, you
18 know, how long to do all the cleaning of the --
19     Q   Oh, I see.  So what you are saying is that like
20 the clinical part of it will be the same, like you have
21 the same system, same type of machines, that sort of
22 stuff?
23     A   Yes.
24     Q   Apart from the clinical aspects of it, though,
25 you don't know how the other facilities operate;

Page 166

1  correct?
2         MS. CALANDRA:  Objection to form.
3         THE WITNESS:  I cannot speak of about how their
4  FA -- you know, the office people.
5  BY MS. von GRABOW:
6      Q   Because it's a different FA at a different
7  clinic; correct?
8      A   Within the same region, it has the same rules.
9      Q   How do you know that?
10     A   Because we are -- it's the same language that
11 they use.  You know, like, Melmarie, the one from Lake
12 Elsinore, I can't give you the 12 hours because I can
13 only give you eight -- I am not sure, eight or 10, you
14 know, stuff like that.
15        It's the language and what they tell me is --
16 okay.  So they are under the same boss, the FA above
17 them, that's telling them that you can't.  The teammates
18 in that -- in those clinic have the same grievances.
19     Q   How often did you go to Diamond -- well,
20 Diamond Valley, you weren't there.  You were there back
21 in 2006; right?
22     A   I was there 2006.  I trained there for PCT.  I
23 helped them with inventory.  I helped them cover the
24 front, also, but --
25     Q   In 2006; right?

```
                                                      Page 170

 1    he was talking about?
 2         A    Yes.
 3         Q    When did he work at DaVita?
 4         A    I don't have the dates but --
 5         Q    Was it before your separation?
 6         A    Before.
 7         Q    Then I don't care.  It's irrelevant.  Okay?  I
 8    just want to try and cut to the chase a little bit here.
 9         A    Okay.
10              MS. von GRABOW:  Can you go back?  I don't know
11    what my question was.
12              THE REPORTER:  "Question:  Do you know how the
13         facility administrators at each of the facilities
14         managed their budget, for example?  I am asking
15         your personal knowledge about that.
16    BY MS. von GRABOW:
17         Q    Please answer that question.
18         A    Yes.
19         Q    You have personal knowledge about how every
20    facility administrator managed their budget in DaVita?
21         A    In -- not every, in general.
22         Q    What do you mean -- don't tell me what it is
23    yet.  I just want to know what you mean by in general.
24         A    Well, since it's -- it's some of the
25    conversation I had with my husband prior, you know, to
```

Page 172

1  bonus.
2          And there was also -- so this is what I have
3  seen.  I am not saying that it's the over -- you know,
4  the leftover for the budget, and I have -- I have seen
5  Debbie getting bonuses for like when we put away stuff
6  for her to document storage.
7      Q   My question was what basis do you have for
8  personal knowledge about how facility administrators
9  managed their facilities.
10     A   What do you mean?
11     Q   Sure.  So you said you generally know how all
12 of the facility administrators in the entire DaVita
13 company --
14     A   That's not what I said.
15     Q   So that's not what you are saying.
16     A   That's not what I said.  I said I have like an
17 idea.  I am not saying it's the whole -- I can only go
18 by the conversation we had, my husband and I, and what I
19 have seen when putting together old documents for
20 storage.
21     Q   These bonus checks that you are referring to --
22     A   Yes.
23     Q   -- any other basis you have for your personal
24 knowledge of how facility administrators manage their
25 clinics?

Page 173

1      A    No.
2      Q    So if you can turn back to 4 -- so, I am sorry,
3  I am going back to Exhibit 5.  And if you could turn --
4  let's continue on with 4.  My question was your factual
5  basis that all nonexempt Dream Team Palmer employees
6  provided dialysis care.  Did they all have the same job
7  duties?
8           MS. CALANDRA:  I am sorry, page 4 or Question
9  4?
10          MS. von GRABOW:  Page 5, Question 4.
11          MS. CALANDRA:  We have got it.
12 BY MS. von GRABOW:
13     Q    And, again, we had asked you to admit that you
14 did not have a similar job description to every
15 nonexempt employee that worked in the Dream Team
16 Palmer --
17     A    Okay.
18     Q    -- during the relevant time period.  Do you see
19 that?
20     A    Okay, yes.
21     Q    And you denied it, and I asked you for the
22 factual basis for your denial.  Have you now testified
23 as to all of the factual reasons you have for denying
24 Request for Admission No. 4?
25     A    I don't understand that.

Page 178

1    Q    You were permitted to record all of your time;
2    correct?
3    A    Recording, yes.
4    Q    And the time that you reported was accurate;
5    correct?
6    A    My recording of it?
7    Q    Yes.
8    A    Yes.
9    Q    Number 9.  "Defendants and their agents and
10   representatives never told you to work off the clock."
11   Do you see that we asked you to admit that?
12   A    Yes.
13   Q    So is that an accurate statement, that
14   defendants and their agents and representatives never
15   told you to work off the clock?
16   A    Yes.
17   Q    In response to No. 9 you denied that.  You
18   said, "Plaintiff denies the Defendants or their agents
19   never told her to work off the clock."  So that's not an
20   accurate response, then; correct?
21        MS. CALANDRA:  Objection to form.
22        THE WITNESS:  Okay.  Say that again.
23   BY MS. von GRABOW:
24   Q    Sure.  Number 9 we asked you -- let me ask it
25   this way.  I am just going to ask you it a different

Page 179

1  way.  Did anyone at DaVita ever tell you not to record
2  your time?
3       A    No.
4       Q    Did anyone at DaVita ever tell you to work off
5  the clock?
6       A    No.
7       Q    And so I guess that goes to No. 10 as well.  We
8  asked you to admit that defendants and their agents and
9  representatives never told you do not record all hours
10 worked.  That is actually a true statement; correct?
11 Nobody at DaVita ever told you not to record your hours
12 worked; correct?
13      A    Correct.
14      Q    Number 11 we asked you to admit that you never
15 worked off the clock while employed by either of the
16 defendants.  Do you see that?
17      A    Yes.
18      Q    And is that true, you never worked off the
19 clock; correct?  You recorded all of your time?
20           MS. CALANDRA:  Objection to form and that
21 misstates her testimony.
22           MS. von GRABOW:  I am not misstating.  I am
23 asking a question.
24      Q    Is it true that you never worked off the clock
25 while you were at DaVita?  You recorded all of your

Page 181

1   Q   Okay.
2   A   I am sorry.
3   Q   No, no.  I think off the clock in our -- it's a
4   term of art in this kind of a lawsuit.  It means that
5   you weren't recording your time.
6   A   Okay.  I was recording my time through my -- my
7   written log.
8   Q   Okay.
9   A   Yes.
10  Q   And there's not -- there isn't any time that
11  you worked that wasn't recorded either through a punch
12  clock or through your written log; correct?  You
13  recorded all of your time one way or the other?
14  A   I am not perfect or I might --
15  Q   So there might be like a little bit here --
16  but, I mean, to the best of your knowledge you did;
17  correct?
18  A   There might be -- there is -- like on Sundays,
19  because it's a Sunday, it's a family day.  I would go
20  in.  There probably -- I will let her know verbally, not
21  written, you know.  Oh, Deb, I -- I went in on Sunday at
22  this time to this time.
23  Q   You told her that verbally?
24  A   Yes.
25  Q   Why wouldn't you write that down?

Page 182

1   A   Because it's something that I -- I forgot to do
2   because I was -- I just wanted to go out, leave the
3   clinic.  Sometimes I work with my kids.  They are there.
4   Because it's a family day, we came from church.  We ate
5   out, but I have work to do so I just dragged them along.
6   They just sit there while I am doing the computer.
7       Q   Why wouldn't you write that time down?
8       A   I -- I forgot, you know, stuff like that.
9       Q   How often did that happen?
10      A   Not often.  Not often.
11      Q   Could you even estimate?
12      A   In the time that I -- I have been there?
13      Q   No, since 2015.
14      A   Two, three times.
15      Q   And how many hours would you say in those two
16  or three times that that's happened?
17      A   It could be --
18      Q   You had your kids with you, so I can't imagine
19  you were there very long.
20      A   No, no.  The most would be -- like the minimum
21  would be two hours.
22      Q   Okay.
23      A   But no more than four.
24      Q   And you are not able to estimate, as you sit
25  here today, correct, apart from that?

Page 187

1  2018.
2       Q   Let me ask you this, then.  So I appreciate
3  that you don't remember signing this.  I get that.  So
4  with respect to paragraph 8, as you sit here today, can
5  you identify any employees who you know were dissuaded
6  from recording overtime because of the possibility of
7  disciplinary action including termination?
8       A   I don't know about termination, but I know
9  there's a possibility of getting written up.
10      Q   And so what I am asking you is do you know of
11 any employees who were dissuaded from recording their
12 overtime because they were concerned about getting
13 written up or fired?
14      A   No.
15      Q   Paragraph 10 states, "The number of hours
16 allocated per shift and the work expected to be
17 accomplished per shift are determined and set by
18 corporate DaVita for the entire Dream Team Palmer
19 Region."  Do you see that?
20      A   Yes.
21      Q   What personal knowledge do you have for that?
22          Let me stay with that.  What personal knowledge
23 do you have for that, that corporate DaVita set the
24 hours per shift and the work to be expected for the
25 entire Dream Team Palmer, how do you know that?

Page 196

1 considered unauthorized time, I worked it 'off the
2 clock' to avoid being subject to disciplinary action per
3 the Teammate Policies."  Do you see that?
4     A    Correct.
5     Q    Now, that's not a true statement; correct?  The
6 time -- first of all, you testified that the time was
7 authorized; correct?  Your supervisor told you to work
8 the time; correct?
9         MS. CALANDRA:  Objection to form.  I think that
10 misstates what she said earlier.
11 BY MS. von GRABOW:
12     Q    You worked three hours after your shift to do
13 the inventory work; correct?
14     A    Correct.
15     Q    And maybe some other miscellaneous things
16 during that time?
17     A    Correct.
18     Q    That time was authorized by your supervisor;
19 correct?
20         MS. CALANDRA:  Objection to form.
21         THE WITNESS:  It is communicated that I have
22 that amount, but she verifies if I was indeed working.
23 BY MS. von GRABOW:
24     Q    You had her permission to work it; correct?
25     A    Correct.