IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 17-cv-02741-MSK-NYW

**MYRNA HARRIS**, individually and on behalf of others similarly situated,

    Plaintiff,

v.

**DAVITA HEALTHCARE PARTNERS, INC., and
TOTAL RENAL CARE,**

    Defendants.

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-
and
\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

Civil Action No. 17-cv-02744-MSK-NYW

**LILYBETH COPE**, individually and on behalf of others similarly situated,

    Plaintiff,

v.

**DAVITA HEALTHCARE PARTNERS, INC., and
TOTAL RENAL CARE,**

    Defendants.

---

**OPINION AND ORDER GRANTING IN PART MOTIONS FOR JUDICIAL NOTICE
AND TOLLING**

---

**THESE MATTERS** come before the Court pursuant to the Plaintiffs' Motions to Grant Judicial Notice and Tolling of the Statute of Limitations (**# 44** in the -2141 case, **# 45** in the -2744 case), and their associated responses and replies; and the Defendants' (collectively,

1

"DaVita") Motions for Leave to File Surreplies (**# 90** in the -2741 case, **# 88** in the -2744 case) in response to the substantive motions, and their corresponding responses and replies.

The Court assumes the reader's familiarity not only with the proceedings to date in these cases, but also the proceedings in several related cases including *Oldershaw v. DaVita Healthcare Partners,* D.C. Colo. Case No. 15-cv-01964-MSK-NYW. The named Plaintiffs in the cases herein, Ms. Harris and Ms. Cope,[1] are employees of DaVita. Ms. Harris worked as an administrative assistant in DaVita facilities in Colorado Springs, which is located in what DaVita refers to as the "Apex Palmer" region, encompassing all DaVita facilities in Montana, Kansas, Missouri, and parts of Wyoming, Utah, Colorado, Nebraska, Oklahoma, Iowa, Illinois, Arkansas, and Texas. Ms. Cope worked as a registered nurse in DaVita facilities in San Diego, California, which is located in the "Dream Team Palmer" region, encompassing Arizona, California, and Nevada. Both allege that they worked more than 40 hours in a week for DaVita without being paid overtime and assert (among others) claims for unpaid overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207.

Both Plaintiffs seek to pursue their FLSA claims under the collective action procedures of 29 U.S.C. § 216(b), which provides that such claims may be maintained "for and in behalf of [the plaintiff employee] and other employees similarly situated." However, the same statute also provides that "[n]o employee shall be a party plaintiff to any such action unless he gives his

---

[1] Several additional DaVita employees have filed opt-in notices in both cases. Although opt-in Plaintiffs enjoy a variety of benefits during the litigation, for purposes of the inquiry here, they are largely irrelevant. The Court's focus at this stage is on the similarity between the <u>named</u> plaintiff(s) and the group of co-workers to whom *Hoffman-LaRoche* notices are requested to be sent. Opt-in plaintiffs are <u>not</u> named plaintiffs, and do not become so unless and until they are included in a properly-filed Amended Complaint. Put differently, if Ms. Harris is the only named Plaintiff in her case, the scope of notice is limited to those who are similarly-situated to <u>her</u>, regardless of their potential similarity to other co-workers who subsequently opted into Ms. Harris' case.

consent in writing to become such a party and such consent is filed in the court in which such action is brought."

In implementing the FLSA's collective action procedures, the 10th Circuit has endorsed a two-stage process. In the first stage, the court makes a preliminary and deferential finding as to the potential scope of those co-workers who could be described as "similarly-situated" to the named plaintiffs. That preliminary designation of the collective allows the plaintiffs to send *Hoffman-LaRoche*[2] notices to the affected co-workers and invite them to file forms opting into the litigation. After discovery and further proceedings, the court undertakes a second, more searching inquiry into whether the plaintiffs opting into the litigation are indeed similarly-situated to the named plaintiffs. If they are not, the court has broad latitude as to how to dispose of the claims of the opt-in plaintiffs. *See generally Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001).

These cases are at the first stage, seeking designation of appropriate collectives for the issuance of *Hoffman-LaRoche* notices. The consequences of the Court's determination at this stage are limited to the issuance of notices. *Genesis Healthcare Copr. v. Symczyk,* 569 U.S. 66, 75 (2013). Thus, courts making such first-stage determinations generally apply a "lenient" standard, requiring the plaintiffs to make "nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."[3] *Thiessen*, 267 F.3d at 1102-03.

---

[2] *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 171-72 (1989).

[3] The Court rejects the Plaintiffs' argument that it should instead adopt the even looser standard articulated by *Turner v. Chipotle Mexican Grill, Inc.*, 123 F.Supp.3d 1300, 1309 (D.Colo. 2015). *Turner* appears to suggest that the only constraint on the scope of the first stage determination is whether the "workers [are] bringing the same statutory claim against the same employer." Although this Court agrees with several aspects of Judge Kane's analysis in *Turner*,

With these standards in mind, the Court turns to the record before it. Both named Plaintiffs allege, in virtually identical declarations, that "the number of hours allocated per shift and the work expected to be accomplished per shift are determined and set by corporate DaVita for the entire [applicable] region." The Plaintiffs go on to state that "the number of hours allotted per shift were not enough to accomplish the work expected per shift and I was unable to complete my job duties within the allotted time." Thus, the Plaintiffs allege that they were "often required to work off the clock and [were] not paid for all hours worked, including overtime." They acknowledge that they were instructed that they could obtain authorization from their supervisor, but that they "were dissuaded from reporting overtime worked because of the possibility of disciplinary action." Based on these facts, the Plaintiffs request approval of notice to be sent to all hourly employees in all DaVita clinics in their respective regions.

In a recent decision making a second-stage determination in the *Oldershaw* case, this Court emphasized that one of the important considerations in defining the scope of similarly-situated employees is identifying "the locus of decisionmaking" – that is, identify the person or persons who bear the most direct responsibility for the alleged overtime violation. The Plaintiffs' arguments here attempt to fix the locus of decisionmaking about overtime at a high corporate level. They point to the deposition of Justin Searle, one of DaVita's high-ranking officials, who testified extensively about DaVita's practices of fixing budgets for its facilities (including labor budgets) and rewarding facilities that stay within those budgets. The Plaintiffs posit that DaVita's budgeting is too aggressive, leaving employees unable to complete all of their

---

it does not agree that the standard the Court should apply at the first stage is so ephemeral. *Thiessen* makes clear that the existence of "a single decision, policy, or plan" is necessary to knit together a collective, not simply the fact that all potential plaintiffs are employed by the same employer.

tasks in the amount of time that Mr. Searle sets, and requiring them to have to work off-the-clock. But there is also substantial evidence in the record – submitted by the Plaintiffs themselves – that also show that, at a corporate level, DaVita takes considerable steps to <u>prohibit</u> employees from performing the very off-the-clock work that the Plaintiffs claim to have done. DaVita's employee handbook makes clear that workers "are prohibited from conducting any DaVita business outside their normal work hours," and that they may seek approval of their supervisors to "work during normal off-duty hours."

In a recent decision in *Olderhsaw*, this Court found evidence that, DaVita's budgeting notwithstanding, the actual locus of decisionmaking regarding whether employees were refused overtime or encouraged to work off-the-clock was at the individual facility level with individual facility administrators. Admittedly, the record before this Court in *Oldershaw* is not the same record before it here, and the stricter standard being applied in that case is different than the lenient standard this Court considers here. But *Oldershaw* suggests that this Court consider the possibility that, on the instant record, the locus of decisionmaking is lower in the organizational chart than the Plaintiffs contend. It is notable that both DaVita's handbook and the Plaintiffs' own affidavits posit that individual facility administrators have the discretion to approve employee overtime. This would seem to suggest that it is an individual administrator's judgment, rather than an inflexible DaVita budget, that determines whether overtime is approved or, conversely, whether an employee must work off-the-clock.

Looking more closely at the deposition testimony of each named Plaintiff, Ms. Cope's first supervisor at the College clinic was an individual named Tony Humphrey. Ms. Cope asked Mr. Humphrey to make adjustments to some of her time records to reflect training time she incurred while off-the-clock, and Mr. Humphrey did so. Ms. Cope testified that during the time

5

Mr. Humphrey was her administrator, she got paid for all the time she worked. Later, David Butera became Ms. Cope's administrator, and Ms. Cope began working shifts that called upon her to open and close the facility. The timing on these shifts was particularly tight, as she was scheduled to start her shift at 4:30 a.m., but Mr. Butera also wanted patients to begin their dialysis treatments by 4:30 a.m. Ms. Cope initially attempted to accommodate those conflicts by clocking in early and performing her initial patient assessments before 4:30, but Mr. Butera lectured her about doing so (citing to the need to comply with the labor budget). Ms, Cope protested that it was impossible to both follow her shift schedule and accommodate Mr. Butera's instructions about patient timing, and Mr. Butera instructed her to do so anyway, presumably by performing assessments while the patients were already beginning treatments. Citing to patient safety concerns, Ms. Cope refused to do so and informed Mr. Butera that she would continue to do patient assessments before 4:30 a.m., and Mr. Butera responded "do whatever you need to do but clock in at 4:30." (Ms. Cope describes a functionally similar problem with closing shifts and working off-the-clock after clocking out at the end of her shift.) Mr. Butera <u>did</u>, however, adjust Ms. Cope's time records when she asked him to do so to accommodate training lessons she undertook while off the clock and he would approve adjustments to her time records when she forgot to clock back in after a meal period. Ms. Cope also had an administrator named Anne Rupp. Like Mr. Butera, Ms. Rupp learned that Ms. Cope was arriving and beginning work at 4:15 a.m., but not clocking in until 4:30. Ms. Rupp instructed Ms. Cope "not to do that," but Ms. Cope testified that she continued to do it anyway.

From this testimony, certain aspects of Ms. Cope's affidavit become sharpened. It is somewhat misleading for Ms. Cope to state categorically that "I was unable to complete my job duties within the allotted time." The record reflects that when Mr. Humphrey was her

6

administrator, she was either able to complete her work during her shifts or that Mr. Humphrey allowed her to clock in and out beyond her scheduled shift times. This, in turn, suggests that only some jobs – *e.g.* opening and closing shifts – were arguably underbudgeted by DaVita. Her testimony also introduces some ambiguity into Ms. Cope's statement that all employees were "dissuaded from reporting overtime worked," as there is evidence that some of her unreported time was accepted when she notified her administrator of it.

Turning to Ms. Harris' deposition, she was an administrative assistant in in several facilities. She has several claims for unpaid overtime. As to her time at the Fountain clinic, she testified that she was not paid for time she spent going to Safeway before her shifts to pick up birthday cakes or balloons for patients a few times her week. She did not report this time to her administrator, but did not particularly elaborate as to why not. (She also has some unique claims relating to uncompensated time helping to pack up and move items when the Fountain clinic closed and relocated.) At the Printers Place clinic, she worked unrecorded time when she was called off of her lunch break "to stock supplies, take in the inventory, help with a patient, [or] answer a phone call." She did not clock in for these events because her administrator told her it was "mandatory" that she take a half-hour off-the-clock lunch break. She acknowledged that she did not ask her administrator to correct her time entries in these circumstances because the lunch break was required. (Ms. Harris seemed to acknowledge that she could have complained to her administrator's superiors about the issue, but did not do so "for fear I would lose my job.") She also testified that if a delivery came late, she would work off-the-clock to put the supplies away, and would not ask to have her time adjusted because her administrator would state, in weekly meetings, that no overtime would be allowed (again, due to budget concerns). She acknowledged that she did not specifically ask her administrator Andrew Gonzales, to adjust her

7

time in these circumstances (she mentioned having done the work and he thanked her, but she did not specifically ask him for a time adjustment), partly because another administrator, Geri Steck, would repeatedly tell employees that no overtime would be permitted.

Ms. Harris' testimony also colors the interpretation the Court should give to her affidavit. None of the incidents that Ms. Harris discussed entailed her being unable to complete all of the duties of her shift because the hours allocated to her by DaVita's budgeting system "were not enough to accomplish the work expected per shift." Rather, the record reflects that her unpaid overtime generally arose when exigencies called for her to perform work during her unpaid lunch break and that no adjustments were made because lunch breaks were "mandatory." Likewise, the fact that late deliveries sometimes required her to stay past her shift end time does not suggest that DaVita somehow mis-budgeted the time it took for her to complete her regular duties. Nor did Ms. Harris testify that she, personally, was dissuaded from asking Mr. Gonzales to adjust her time records when she worked overtime (although it appears that she never did). She testified that she <u>was</u> dissuaded from asking Ms. Steck to adjust her time because Ms. Steck frequently told employees that no overtime would be permitted.

Based on this record, the Court finds that the Plaintiffs have not come forward with substantial evidence that places the locus of decisionmaking for their unpaid overtime anywhere above the level of their individual facility administrators, and certainly not at a level that would suggest that DaVita encouraged off-the-clock work on a regional basis. Although the record supports a suggestion that DaVita provided administrators with a labor budget and incentives to comply with it, the record reflects that it was the individual facility administrators' decisions as to <u>how</u> (or even <u>if</u>) to comply with those budgets that determined whether or not an employee would be discouraged from claiming overtime or encouraged to work off-the-clock. Because, at

8

best, the "single decision, policy, or plan" that predicted whether they would be deprived of overtime is limited to the identity of the particular facility administrator in charge, the Court will approve the issuance of *Hoffman-LaRoche* notices, but on a far more narrow geographic basis than that requested by the Plaintiffs. Instead, the Court will approve notices given to the following groups:

> • In Ms. Harris' case (-2471), the Court approves notice to be sent to "all current and former hourly workers of DaVita who worked under the supervision of Geri Steck or Andrew Gonzales from August 6, 2015[4] to the present and who were not paid time and a half for all hours worked in excess of 40 per week."
>
> • In Ms. Cope's case (-2744), the Court approves notice to be sent to "all current and former hourly workers of DaVita who worked under the supervision of David Butera or April Rupp from August 6, 2015 and who were not paid time and a half for all hours worked in excess of 40 per week."

Except as may be necessary to modify them to comport with the definitions set forth above, the Court approves the Notice and Consent Forms tendered by the Plaintiffs with their motions. DaVita shall produce to the Plaintiffs a list of the names and last-known addresses of all employees meeting the definitions above within 30 days of this Order, and the Plaintiffs shall

---

[4] In selecting this date, the Court grants in part the Plaintiffs' request for a tolling of the statute of limitation. The limitation period for a named plaintiff is tolled from the date the action is filed, but the limitation period for an opt-in plaintiff is tolled only from the date the plaintiff files their consent to join the action. 29 U.S.C. § 256; *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1106-07 (11th Cir. 1996). Moreover, because potential opt-in plaintiffs should not be disadvantaged by the time it takes the court to decide a motion seeking the issuance of notice, this court elects to equitably toll the limitation period from the date briefing on the Plaintiffs' motion was complete; in essence, this Court will not penalize any timely opt-in plaintiff for any amount of time that this motion was under consideration by the Court. *Compare Betts v. Central Ohio Gaming Ventures, LLC*, ___ F.Supp.3d ___, 2019 WL 181215 (S.D.Oh. Jan. 11, 2019) (equitably tolling the limitations period beginning six months after the motion for notice was fully briefed, finding that it would be reasonable for the court to take that long to resolve the motion). The period also reflects the full 3-year limitation period available for willful violations of the FLSA, although the Court makes no determination at this time as to whether the Plaintiffs can satisfy that predicate. 29 U.S.C. § 255(a).

effectuate the mailing of such notices within 60 days of this Order. (The draft notices provide for a 90-day opt-in period, which the Court also approves.)

For the foregoing reasons, the Plaintiffs' Motions to Grant Judicial Notice and Tolling of the Statute of Limitations **(# 44** in the -2141 case, **# 45** in the -2744 case) are **GRANTED IN PART** as set forth herein, and DaVita's Motions for Leave to File Surreplies **(# 90** in the -2741 case, **# 88** in the -2744 case) are **GRANTED**.

Dated this 4th day of February, 2019.

                                                **BY THE COURT:**

*Marcia S. Krieger*

                                                Marcia S. Krieger
                                                Chief United States District Judge